UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

NATHAN SPEIGHTS,

                                     Petitioner,

    vs.                                                                       9:10-CV-382
                                                                             (LEK/ATB)
JOHN P. LEMPKE,

                                       Respondent.
_____

NATHAN SPEIGHTS, Petitioner, *pro se*
LEILANI J. RODRIGUEZ, Asst. Attorney General for Respondent

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

      This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

      Petitioner brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging a judgment of conviction rendered in the Onondaga County Court on November 23, 2005. Petitioner was convicted after a jury trial of Criminal Possession of a Weapon, Second Degree, N.Y. Penal Law § 265.03.[1] Petitioner was sentenced to a term of fifteen years to be followed by five years of post-release supervision. The Appellate Division, Fourth Department affirmed his conviction on November 14, 2008, and the New York Court of Appeals denied leave to appeal on

---

[1] When petitioner was convicted, the applicable subsection was 265.03(2). However, beginning in 2005, there was a series of revisions to the statute. Currently, the section under which petitioner would have been convicted is 265.03(1)(b), which states that a person is guilty of second degree weapons possession, when he or she possesses a loaded firearm with the intent to use it unlawfully against another.

January 23, 2009. *People v. Speights*, 56 A.D.3d 1232, 868 N.Y.S.2d 429 (4th Dep't 2008), *lv. denied*, 11 N.Y.3d 930, 874 N.Y.S.2d 16, 902 N.E.2d 450 (2009).

    Petitioner raises one ground for this court's review:

(1)    The evidence was insufficient, and the verdict was against the weight of the evidence. (Pet. ¶ 12(A) (Dkt. No. 1).

Respondent has filed an answer and memorandum of law, together with the pertinent state court records.[2] (Dkt. Nos. 5-7). The state court records are also listed in respondent's answer. (Dkt. No. 5 ¶ 4(a)-4(f), 5). Respondent argues that federal claim of insufficient evidence is meritless, and that the related state law claim that the verdict was against the weight of the evidence is not cognizable on federal habeas corpus review. (Dkt. No. 6 at 12-16). For the following reasons, this court agrees with respondent and will recommend dismissal of the petition.

## DISCUSSION

**I.    Facts**

    The charges against petitioner arose due to an incident that occurred at approximately 5:00 a.m. on April 3, 2005 in the parking lot of the Road Dawgs Motorcycle Club, an "after hours" club in Syracuse, New York. The victim, Mark Sardella was shot and killed. At trial, Syracuse Police Officers Jonathan Hamblin and Gregory Tackley testified that they were on duty in the early morning hours of April 3, 2005. (T. 277, 303). As the officers were sitting in their patrol vehicles in a gas

---

[2] The records are marked as Exhibits A-F. The trial transcript, however, was filed separately and is simply labeled "Transcript." (Dkt. No. 7-7, 7-8).

station parking lot, approximately five to six blocks away from Road Dawgs, they heard shots fired. Officer Tackley heard the first volley of shots because he was already parked in the lot with his window down. (T. 304). Officer Hamblin drove into the lot and rolled down his window to speak with Officer Tackley, and both officers heard the second round of shots. (T. 278, 304).

Shortly after they heard the shots, they received a call, dispatching them to Bellevue and Midland Avenues, the location of the shooting. (T. 279). The officers knew that there had been a big after-hours party at Road Dawgs that night. (T. 280). As the officers drove to the scene, they noticed many cars coming toward them in the opposite direction, and when they arrived at Road Dawgs, there were people "fleeing" the area. (T. 280-82). On cross-examination, Officer Tackley agreed that it was a "chaotic scene" and that about one hundred people were running around the area and out of the parking lot. (T. 309).

As the officers drove into the parking lot, they noticed what appeared to be a car accident in the lot. (T. 283). A blue Trail Blazer had rear-ended a Dodge Caravan, the door of the Blazer was open, and a man was slumped over from the driver's seat into the passenger's seat. *Id.* Officer Hamblin testified that he got out of his car to check the situation and noticed that the man in the Blazer was unresponsive, and his breathing was very labored.[3] *Id.* Medical personnel then arrived to take over, and Officer Hamblin had no further involvement with the victim. *Id.*

Other officers and evidence technicians arrived at the scene and testified at trial

---

[3] As stated above, the victim later died.

regarding further contact with the victim, the investigation of the area, and the collection of evidence.  It was raining that night, and Officer Joseph Szakacs, an evidence technician, took pictures of the scene, including pictures of the victim. (T. 310-20).  Detective Steven Kilburn also testified about the investigation. (T. 338-40).  A closer examination of the victim showed that he had been shot. (T. 338).  Officer Szakacs testified that the victim was bleeding from his left side. (T. 320).  The officers then cordoned off the area and began speaking with possible witnesses to the shooting. (T. 338, 347).  They interviewed members of the Road Dawgs security staff and other employees of the club. (T. 348).

Detective Kilburn went to the hospital after the incident and spoke with some individuals who gave him the name "Michael Bailey" as someone who may have been involved in the shooting. (T. 349).  On cross-examination, Detective Kilburn testified that on April 7, 2005, he interviewed Devlin Brown, who was brought to the Central Investigations Division (CID) and told police officers that she saw Sean Brumfield in the center of the parking lot, holding a gun the night of the shooting, but she never saw him fire that gun. (T. 351).

Detective James Kimak assisted in the search of the parking lot and drew a sketch of the area. (T. 358-63).  On cross-examination, he testified that he saw eight, nine millimeter shell casings on the ground, and glass on the floor of the driver's side of the Blazer. (T. 368).  Evidence Technician, Martin Judge, the coordinator of the crime scene unit, recovered the nine millimeter shell casings. (T. 371-75).  Police also found a plastic bag with "green leafy material" in it, broken glass inside and behind

the car, and a key outside the car. (T. 375-77). A bullet was also recovered from the rear passenger door of the car parked next to the Blazer. (T. 378). Paul Marchiterre, a firearms expert, examined various pieces of metal, projectiles, and casings that were recovered from the scene. (T. 559-80). He testified that, based on the characteristics of the bullets and the shell casings that he examined, anywhere from four to seven guns could have been used in the shooting. (T. 559-80).

Dr. Abraham Philip, an Onondaga County Medical Examiner testified that the victim died of multiple gunshot wounds. (T. 599). Mr. Sardella had four gunshot wounds to his body and a "graze injury" on his left upper arm. (T. 592). Dr. Philip described the trajectory and the effect that each of the bullets had on the victim. (T. 592-93). Dr. Philip only recovered three projectiles because the fourth bullet went all the way through the victim's body and was not recovered by the medical examiner. (T. 593-94). One of the three bullets was "jacketed,"[4] and the other two were "non-jacketed." (T. 594-95). On cross-examination, Dr. Philip testified that the victim had both marijuana and cocaine in his system. (T. 604).

Two women who were at Road Dawgs the night of the shooting, Shannon Scott and Talaka Frazier, testified for the prosecution. (T. 408-453, 485-548). During direct examination, Shannon Scott testified that she went to the Road Dawgs Motorcycle Club with Clintrese Hill[5] at 3:00 a.m. on April 3, 2005. (T. 412). Ms. Scott knew the

---

[4] Dr. Philip defined a "jacketed" bullet as one with a copper coating, whereas a non-jacketed bullet does not have such a coating. (T. 594).

[5] Ms. Scott initially identified her friend as "Trese" Hill (T. 412), however, on cross-examination, she stated that her friend's name was "Clintrese." (T. 432).

5

victim, Mark Sardella, and saw him at the club, listening to music and dancing. (T. 412-13). Ms. Scott stayed at the club until it closed at 5:00 a.m. (T. 414). When she went out to the parking lot, she heard approximately six gun shots, and she saw someone shooting a gun out the window of a black truck. (T. 416-17, 421). Ms. Scott stated that she then saw petitioner standing in front of the car, shooting a black gun. (T. 418-19). Before he started shooting, he said: "Give me that shit." (T. 422). Ms. Scott stated that she could not tell to whom petitioner was speaking. *Id.* She also testified that he was wearing a red shirt, red hat, and jeans. (T. 421).

On cross-examination Ms. Scott testified that she did not speak to anyone about the incident until several days later on April 10. (T. 430). She also admitted that there were other people wearing red that night, and ultimately, she testified that she really did not know whether petitioner was the person with the gun. (T. 443). On redirect, she reiterated her statement that she was no longer sure that petitioner had a gun, and stated that she did not want someone to go to jail for something he did not do. (T. 448). She had hired an attorney because she did not want to testify. (T. 447). She admitted, however, that she did identify petitioner in the statement she gave to police on April 10th. At trial, when the prosecutor asked her if anyone had "threatened" her into changing her statement, she said, "Not yet." *Id.*

Talaka Frazier testified that she was at Road Dawgs on the night in question, and that she saw both petitioner and Sardella in the parking lot after the club closed, but she could not remember what petitioner was wearing. (T. 497-502). Sardella was parked next to Frazier, and he was sitting outside the Blazer. (T. 504). After Sardella

got into his truck, Frazier heard shots, coming from the right side of her friend Audrey's vehicle. (T. 504). Frazier testified that she saw "someone" shooting not far from her, but that it was dark. (T. 505). She saw Sardella swing out of the parking space and hit another car. (T. 506). She ran over to see what had happened, opened Sardella's car door and saw that he was breathing heavily, so she called 911. (T. 507). Frazier testified that she stayed with Sardella until the ambulance came, and then she left. *Id.*

On cross-examination, she testified that she was so intoxicated from alcohol and marijuana that it affected her ability to see and remember. (T. 512-23). She also testified on cross-examination that when she heard the shots, she fell to the ground and could not see where the shots were coming from while she was lying on the ground. (T. 530-31). She stated that she did not know petitioner "socially," and that she only knew that it was petitioner because someone else told her that it was. (t. 531). She testified that she saw someone jump out of the victim's car and run away. (T. 534). She also testified that the police wanted to take her statement even though she was so drunk that she did not really know what happened. (T. 536-37).

On redirect, she stated that, in an affidavit to the police, she stated that petitioner shot Sardella, and on cross, she basically stated that her affidavit was not true. (T. 539). At that point, the trial was interrupted, the parties went into the judge's chambers, and when they came out, Ms. Frazier's testimony was stricken. (T. 540-41). Then the prosecutor questioned Ms. Frazier about all the things that she did "recall." (T. 542-45). During this questioning, Ms. Frazier admitted that she went back to the

7

scene of the shooting with the police to show them how the incident occurred. (T. 545-46). On re-cross-examination, she stated that the police kept her fourteen hours to get her statement, but she then admitted that she testified before the Grand Jury. (T. 547).

Shawn Taylor also testified for the prosecution. Shawn Taylor was an inmate who was incarcerated with petitioner at the Onondaga County Justice Center while petitioner was awaiting trial. (T. 605-607). Mr. Taylor testified that he got to know petitioner, and they discussed the shooting. (T. 607-608). Taylor testified that he asked petitioner whether he was going to "beat" the charges, and petitioner said that he would not be convicted because the witnesses could not give a "conscious statement" because of "the alcohol." (T. 608-609). Petitioner told Mr. Taylor that he had a "beef" with the victim, they argued at the club, he caught him off-guard outside the club, and he "let him have it," meaning that petitioner shot the victim. (T. 610-11). Mr. Taylor stated that he told his attorney about the conversation, and his attorney approached the District Attorney. (T. 612). On cross-examination, Mr. Taylor fully admitted his crimes and even admitted that he lied occasionally, but he was not lying in "this situation." (T. 621).

## II.  Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides that a federal court lacks the power to grant a writ of habeas corpus under 28 U.S.C. § 2254

> unless the adjudication . . . (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2)

8

>resulted in a decision that was based on an unreasonable determination of
>the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. 2254(d). *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(d)(1)) (alterations in original).[6] Clearly established federal law "means 'the holdings as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003); *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)) (alterations in original).

In order to apply this standard under the AEDPA , the petitioner's claim must have been "adjudicated on the merits" in the state court proceedings. 28 U.S.C. § 2254(d)(1). *See also Day v. Taylor*, 459 F. Supp. 2d 252, 256 (S.D.N.Y. 2006) (a federal court's ability to review a habeas petition depends on whether the state court adjudicated the petitioner's claims on the merits or on procedural grounds). Under the AEDPA, a state court's factual findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence. 28 U.S.C. § 2254 (e)(1). If the state court failed to decide a claim "on the merits," the pre-AEDPA standard of review applies, and both questions of law and mixed questions of law and fact are reviewed *de novo*. *Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).

A decision is "contrary to" clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by the [Supreme Court] on

---

[6] Prior to the AEDPA, the court was not required to defer to state court determinations on pure questions of law and mixed questions of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 107-113 (1995). When presented with these questions, the court was empowered to conduct an independent review of the record. *Id*.

a question of law or if the state court decides a case differently than [the Supreme Court] on a set of materially indistinguishable facts," or if the state court identifies the appropriate legal standard, but unreasonably applies it to the facts of the petitioner's case. *Williams*, 529 U.S. at 413. The lower court may not grant the writ if it concludes "in its independent judgment" that the state-court decision applied clearly established federal law erroneously or incorrectly, rather, the application must also be unreasonable. *Id.* at 411. In order for the application to be "unreasonable," there must be "some increment of incorrectness beyond error," but that increment may not be too great, otherwise habeas relief would be limited to those state court decisions that are "so far off the mark as to suggest judicial incompetence." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

### III.     Sufficiency of Evidence

####     1.     Legal Standards

The Due Process Clause of the Fourteenth Amendment prohibits conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Consequently, a state prisoner "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). In evaluating sufficiency, the evidence must be viewed in the light most favorable to the prosecution. *Id*. at 318-319. When considering the sufficiency of the

evidence of a state conviction, a habeas court must look to state law to determine the elements of the crime. *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002).

A habeas court must defer to the assessments of the strength of the evidence and credibility of the witnesses that were made by the jury. *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996). Guilt beyond a reasonable doubt may be established entirely by circumstantial evidence, *Id.,* and this evidence must not be reviewed piecemeal, but rather as a whole. *United States v. Khan*, 53 F.3d 507, 513 (2d Cir.1995). Hence, a petitioner bears a "very heavy burden" in convincing a federal habeas court to grant a petition on the grounds of insufficient evidence. *Ponnapula v. Spitzer,* 297 F.3d 172, 179 (2d Cir. 2002) (citing *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir.1993)). When the court is faced with a record that "supports conflicting evidentiary inferences," it must presume under *Jackson*, that the trier of fact resolved any conflicts in favor of the prosecution, and the court must defer to that resolution. *Laurey v. Graham*, 596 F. Supp. 2d 743, 760 (W.D.N.Y. 2009).

### 2.     **Application**

In this case, petitioner's only federal[7] ground for relief argues that the evidence

---

[7] Petitioner also includes the claim that he made in state court that the verdict was "against the weight of the evidence." Under New York State law, a "weight of the evidence" claim and a "legal sufficiency" claim are related, but have distinctly different standards. *See People v. Bleakley*, 69 N.Y.2d 490, 515 N.Y.S.2d 761, 508 N.E.2d 672 (1987). A claim that the verdict is against the "weight of the evidence" is a purely state law claim, based upon N.Y. CRIM. PROC. LAW § 470.15, whereas a legal sufficiency claim is based upon federal constitutional principles. *See Garbez v. Greiner*, 01 Civ. 9865, 2002 WL 1760960, at * 8 (S.D.N.Y. July 30, 2002) (citing *People v. Bleakley*, 69 N.Y.2d 490, 515 N.Y.S.2d 761, 508 N.E.2d 672 (1987)). Thus, to the extent that petitioner is raising a claim that the verdict was "against the weight of the evidence," it is not cognizable in federal habeas corpus and should be dismissed.

was insufficient to convict him of Criminal Possession of a Weapon, Second Degree.[8] The relevant section of the New York Penal Law provides that a person is guilty of second degree criminal possession of a weapon when:

> (1) with intent to use the same unlawfully against another, such person:
>
> . . .
>
> (a) possesses a loaded firearm[.]

N.Y. Penal Law § 265.03(1)(a). Petitioner's argument is essentially that no reasonable jury could have found beyond a reasonable doubt that he possessed a gun on the night in question because the witnesses were inherently incredible. The Appellate Division clearly decided the issue on the merits, stating that "[v]iewing the evidence in the light most favorable to the People, . . . we conclude that it is legally sufficient to support the conviction." 56A.D.2d at 1233 (citing *People v. Contes*, 60 N.Y.2d 620, 621 (1983) (citing *Jackson*, 443 U.S. at 319); *People v. Bleakley*, 69 N.Y.2d 490, 495 (1987)).

The court also rejected petitioner's claim that the verdict was against the weight of the evidence, pointing out that where witness credibility "is of paramount importance," great deference must be given to the jury's determination. *Id.* (citations omitted). The court found no reason to disturb the jury's credibility determination. *Id.* Clearly, the Appellate Division decided petitioner's federal claim on the merits, and this court must, therefore, apply the AEDPA standard to its review of the petition. Applying the AEDPA standard to petitioner's insufficiency claim, this court finds that

---

[8] As stated above, the jury acquitted petitioner of the Murder, Second Degree charge.

the Appellate Division did not unreasonably apply *Jackson* to the facts of petitioner's case.

A review of the facts of this case supports the court's findings. On direct examination, Shannon Scott stated that she saw petitioner standing in front of the car, and he was shooting a black gun like the ones that police use. (T. 418-19). However, she changed her story between the time of direct and cross examination. By the end of her testimony, she stated that she was not sure that it was the petitioner who was shooting that night, and she did not want to see someone go to jail for something he did not do. (T. 443, 448, 452). Although Talaka Frazier stated that she knew both the victim and the petitioner and gave the police a sworn statement that petitioner shot at Mr. Sardella, by the time of trial, she stated that she saw someone shooting, but that it was dark. (T. 497-505). On cross-examination, she stated that her affidavit to the police was not true, and that she was so intoxicated that she did not really know what happened. (T. 538-39).

While it is true that both Scott and Frazier changed their stories from the statements that they gave to the police, the determination of their credibility is not for this court. On redirect examination of Ms. Scott, she admitted that she had an attorney of her own because she decided that she did not want to testify, and when asked whether she had been threatened, she said, "Not yet." (T. 447-48). The jury could have interpreted this statement as implying that she was afraid that she would be threatened if she identified the petitioner. She also admitted that in her April 10, 2005 statement she did identify the petitioner as the individual she saw with a gun. (T. 452).

13

Petitioner's counsel emphasized the fact that Ms. Frazier was very intoxicated, and Frazier testified to drinking a great deal of alcohol and smoking marijuana that night. (T. 511-25). She also testified that the prosecutor wanted to take her statement even though she was so drunk that she did not really know what happened. (T. 536-37). However, Ms. Frazier also testified that, notwithstanding this substantial intoxication, she saw someone shooting, and that after the shots were fired, she ran over to Mr. Sardella's truck, called 911, and stayed with him until the ambulance came. (T. 505-507). The jury was entitled to reject her statements that she was so intoxicated that she did not know what was happening and could not have properly identified petitioner.

The court would also note that both Shannon Scott and Talaka Frazier testified, consistent with the officers who first heard the shots fired, that there was an initial volley of shots, followed by more shooting. (T. 279, 303-304, 415-17, 418-19, 532). The jury could have viewed this testimony as indicating that these two women were not as intoxicated or as unsure about the events as they later testified. It was also clear from the expert testimony that there was more than one shooter, that there could have been four different guns involved, and that bullets from at least two guns hit Mr. Sardella. Thus, the jury acquitted petitioner of the murder charge. However, this acquittal was not inconsistent with finding him guilty of second degree criminal possession of a weapon.

Petitioner argues that Shawn Taylor was inherently incredible because he was an inmate who was only testifying for the prosecutor in order to get more lenient

treatment. Shawn Taylor testified that he and petitioner talked about the shooting while they were both incarcerated, and that petitioner thought that he would "beat" the charges because the witnesses were intoxicated. (T. 608-09). Mr. Taylor testified that petitioner told him that he had a "beef" with Mr. Sardella, and that he "caught him off guard outside the club" and "let him have it." (T. 610-11). On cross-examination, defense counsel thoroughly explored Mr. Taylor's robbery charges as well as his motives for testifying. (T. 614-21). Essentially, Mr. Taylor testified that he did lie, but he was not lying in "this situation." (T. 621).

While the jury was deliberating, a reading of the testimony of all three of the above witnesses was requested and granted by Judge Walsh. (T. 735). Clearly, the jury considered each of these statements carefully. The court would also point out that the petitioner's fiancee testified regarding their actions after the incident. Ms. Hasan, petitioner, and Ms. Hasan's sister's boyfriend traveled to Buffalo to visit Hasan's sister. (T. 460). They later went to Maryland, but prior to this trip, Ms. Hasan went back to Syracuse by herself to take her sister's boyfriend home. (T. 462). Petitioner and Hasan then traveled to Washington, D.C., where petitioner was ultimately arrested by United States Deputy Marshals. (T. 468).

Although Ms. Hasan testified on cross-examination, that it was her idea to leave Syracuse to visit her sister in Buffalo (T. 477), and she stated on direct examination that petitioner only "ended up" going with her (T. 460), the jury was certainly entitled to believe that petitioner and his fiancée left the area to avoid any potential investigation. When petitioner was arrested by the Marshal in Washington, he had a

red hat with him,[9] consistent with Ms. Scott's testimony that the shooter was wearing a red hat. (T. 421, 427).

Thus, the jury made the credibility determinations that it was entitled to make, and neither the Appellate Division, nor this court may change those findings. The Appellate Division did not unreasonably apply *Jackson* when it found that, viewed in the light most favorable to the prosecution, there was sufficient evidence to find petitioner guilty of the weapons charge beyond a reasonable doubt.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the petition be **DENIED and DISMISSED**, and it is further

**RECOMMENDED**, that a certificate of appealability be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. These objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.</u>** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of HHS*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72.

Dated: March 22, 2011

_____
Hon. Andrew T. Baxter
U.S. Magistrate Judge

---

[9] (T. 485).